The following constitutes
the order of the court. Signed July 15, 2015

_William J. Lafferty, III_

**William J. Lafferty, III**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| In re | Case No. 14-42598 |
| Clyde Eugene Hart, | Chapter 7 |
| Debtor. | |
| Beverly Karaeff,<br>Plaintiff,<br>v. | Adversary No. 14-04081 |
| Clyde Hart,<br>Two Harts, Inc.<br>New Horizon Investments, Inc.,<br>Defendants. | |

## MEMORANDUM OF DECISION REGARDING PLAINTIFF BEVERLY KARAEFF'S ADVERSARY PROCEEDINGS AGAINST DEFENDANT CLYDE HART

This matter came for trial on May 4, 2015. Steven J. Hassing represented the Plaintiff Beverly Karaeff ("Karaeff" or the "Plaintiff" as the context may require); David Smyth represented the Defendant Clyde E. ("Toby") Hart ("Toby" or the "Defendant" as the context may require). At the conclusion of trial, the parties agreed that in lieu of closing statements they would provide the court with post-trial briefs, summing up their assertions and defenses. Per agreement reached at the conclusion of the trial, Defendant filed and served his post-trial brief ("Defendant's Post-Trial Brief") on May 11, 2015; Plaintiff filed and served her post-trial brief ("Plaintiff's Post-Trial Brief") on May 25, 2015. The matter having been tried and submitted, the Court issues this Memorandum Decision.

For the reasons set forth below, the Court determines that the Plaintiff has demonstrated that three of the four transactions set forth in the Complaint created non-dischargeable debts owed by Defendant within the meaning of 11 U.S.C. § 523(a)(2)(A), and the Court will accordingly enter Judgment in favor of Plaintiff and against Defendant in the original principal amount of $400,000.

## I.

## PROCEDURAL HISTORY

This matter is closely related to that certain Adversary Proceeding styled as *Beverly Karaeff v. Debra Hart et al.,* Adv. Pro. No. 11-4177 (the "Prior AP"). Toby was originally named in the Prior AP, but was dismissed from that action by Order entered on December 30, 2011. On May 9, 2012, Karaeff filed an action against Toby in Contra Costa County Superior Court for Fraud, Embezzlement, and Conversion, styled *Beverly Karaeff v. Clyde E. Hart, Two Harts Inc. and New Horizons Investments, Inc.,* Case No. 12-01087 (the "State Court Action"). When Toby filed the underlying chapter 7 bankruptcy case on June 16, 2014, Karaeff timely removed the State Court Action to this Court via a Notice of Removal filed June 24, 2014. Although the State Court Action described causes of action cognizable under California law, and did not expressly reference non-dischargeability issues under § 523(a) of the United States Bankruptcy Code (the "Code"), Defendant has not objected to the form or contents of the Complaint, and, as will be discussed in greater detail below, the Court determines that with respect to three of the transactions set forth below, the allegations set forth in the Complaint, and proven at trial, satisfy the requirements of § 523(a)(2)(A) of the Code.

Debra Hart is the spouse of Toby Hart, and the theories asserted against Debra Hart in the Prior AP included not only theories based upon Debra's direct actions, but also upon Toby's actions, on the theories that (a) as husband and wife and partners in a California limited partnership known as "GTP II", Debra and Toby were each liable for each others' alleged bad acts in the Prior AP, (b) Debra and Toby were each alter egos of the entities that were alleged to have performed certain bad acts, and (c) that Debra and Toby working in concert perpetrated a fraud upon Beverly. Accordingly, even though Toby was not a party in the Prior AP, the Court

-2-

still necessarily examined in great detail the actions of Toby in connection with the transactions set forth in the Complaint, and made a number of findings of fact and conclusions of law concerning Toby's involvement in those transactions.

The Court determined in the Prior AP that three of the four transactions set forth therein created non-dischargeable debts owing by Debra Hart to Plaintiff in the original principal amount of $400,000. In connection with the disposition of the Prior AP, the Court issued a lengthy Memorandum Decision[1] on March 14, 2014, setting forth the Court's findings and conclusions (the "March 2014 Decision"), and a Judgment. Debra Hart appealed the Judgment to the Bankruptcy Appellate Panel (the "BAP"), and on February 26, 2015, the BAP issued its Judgment affirming this Court's determination that Debra Hart owed a non-dischargeable debt to Beverly Karaeff in the original principal amount of $400,000.

In preparation for the trial of this matter, the parties entered into a number of stipulations with respect to the admissibility of matters admitted in the Prior AP. In particular, the parties stipulated to the admissibility of each exhibit offered by both parties in this matter, many of which had been admitted in the Prior AP. Trial Tr. 4:3-25; 5:1-8, May 4, 2015. In addition, the parties also stipulated to the admission of the testimony contained in certain depositions conducted in the Prior AP, as well as all of the testimony offered in the Prior AP. Trial Tr. 6:9-25; 7:1-6.

However, the parties did not stipulate, and Plaintiff has not expressly asserted, that matters determined in the Prior AP should be given preclusive effect—and Defendant raised two issues, or, more precisely, advanced, on different grounds than those advanced in the Prior AP, two defenses to the claims asserted by Plaintiff: (a) that for reasons different from those argued in the Prior AP, Plaintiff's claims herein are barred by the statute of limitations, and (b) that Plaintiff's alleged reliance on representations made by Toby (and Debra) was not justifiable, as

---

[1] Mem. of Decision Regarding Pl. Beverly Karaeff's Adversary Proceedings Against Defs. Debra A. Hart and Lance E. Hart, Adv. Pro. No. 11-04177, ECF No. 95 (Mar. 14, 2014).

-3-

required by § 523(a)(2)(A).[2]  Accordingly, essentially all of Defendant's efforts during the trial focused on these issues, and Defendant did not expressly challenge Plaintiff's assertions that (a) Defendant made false statements to her, (b) Defendant knew that the statements were false when made, (c) Defendant made the statements to induce Plaintiff to rely upon and to act upon them to her detriment, and (d) that Plaintiff was damaged thereby.[3]

The Defendant's apparent concessions as to four of the elements that Plaintiff is required to prove to establish liability under § 523(a)(2)(A) notwithstanding, the Court's analysis below will discuss every element of Plaintiff's cause of action and proof, out of respect for the importance of this matter to the parties, and in the hope that a comprehensive discussion of the issues will assist any reviewing court, should this Court's determination be appealed.

## II.

## FACTS[4]

In the March 2014 Decision, the court made several findings based on the testimony and exhibits submitted by the parties. Karaeff's testimony at the May 4 trial is consistent with testimony in the Prior AP, and the Court's findings presented in the March 2014 Decision. Toby's testimony at the May 4 trial was limited to establishing a statute of limitations defense, and did not controvert, let alone undermine, Karaeff's testimony concerning the history and context of the transactions.   Consequently, many of the findings made by the Court in this adversary proceeding are similar to, and in some cases identical to, findings made by the Court in

---

[2] In Defendant's Post-Trial Brief, Defendant expressly abandoned his defense based upon the statute of limitations. Def.'s Post Trial Br., at 1, ECF No. 21.  The Court accordingly will not consider that defense in connection with this matter.

[3] Although Plaintiff originally set forth numerous causes of action in the Complaint in the State Court Action, at the conclusion of the trial, Plaintiff's counsel stated that she was pursuing solely the fraud and false pretenses claims under § 523(a)(2)(A), which is consistent with the scope of her presentation at trial.  Trial Tr. 77:13-14, May 4, 2015.  Accordingly, the Court will not address claims against Defendant based upon embezzlement or conversion, as those claims might have been pursued under §§ 523(a)(4) and (6) of the Code.  At the conclusion of the trial Plaintiff also dismissed Two Harts Inc. and New Horizons Investments as defendants in this matter, and the Court will accordingly not render a Judgment with respect to those entities. Trial Tr. 98:21-23, May 4, 2015.

[4] The following facts constitute the Court's findings of fact pursuant to Federal Rule of Bankruptcy Procedure 7052.

-4-

the Prior AP.

## A. The Harts and Their Entities

In the March 2014 Decision, the Court went into necessary and lengthy detail with respect to the Harts' background and the entities which they created and controlled. It is unnecessary to engage in an exercise of similar scope in this Memorandum; the facts presented below are intended to provide background regarding the Shady Glen real estate development project which is the subject of this dispute, and show the relative sophistication of the parties with respect to the project.

### 1. The Hart Family

Toby Hart is a licensed real estate broker in California. He has extensive experience remodeling and building homes since 1978, and has had some experience in developing real estate projects. Toby also served as President and CEO of Moss & Moss Realtors during the early 1980's, while also working on real estate-related projects. In 1985, Toby and Debra relocated to the East Bay, and Toby became Regional Vice President, Real Estate division, for Great Western Bank ("GWB"), from 1985 through 1996. Although Toby retired from his job at GWB in 1996, he has continued to buy, develop, build and sell real estate from 1996 until the present. Toby's post-retirement projects included continued work in the home repair and remodeling field, initially as a roofer, under the guise of a number of different corporate entities. As time went on, Toby branched out into more extensive remodeling and construction jobs, again via the use of various corporate entities.

Debra Hart has been a licensed real estate broker in California for over thirty years, and has worked at a number of different real estate brokerages. Over the years, Debra, Toby and their son Lance Hart worked jointly on a number of real estate projects.

### 2. Two Harts, Inc.

Two Harts, Inc. ("Two Harts") was a California corporation formed originally by Troy Hart, Lance's brother, to work on construction projects. Troy and Lance were the shareholders of Two Harts, and Lance placed his contractor's license into the corporation. He used the company

-5-

to work on various real estate projects, including Shady Glen, for which Two Harts was the construction supervisor and general contractor.

### 3. GTP Properties Ltd.

GTP Properties L.P. ("GTP") was a limited partnership the Harts used from time to time in efforts to develop the Shady Glen property. New Horizon Investments Inc ("NHII") was the general partner of GTP. The partnership sought to raise capital through subscribing partnership interests from limited partners. In theory, funds from the limited partners' subscriptions would allow for the acquisition of real property by the partnership and finance construction of a home, or homes, on that property. The Harts first used GTP to raise capital in June 2004, by executing a partnership agreement which issued 4 partnership units to Gary and Jannette Drew for $100,000. That capital, according to the partnership documents, was for the construction of two homes at the Shady Glen site. Pls.' Trial Ex. 3. In August of 2007, the Harts again used GTP to raise capital for the purported development of Lot B, modifying the existing partnership documents only by deleting any references to Lot A, and changing the amount of funds to be subscribed. Pls.' Trial Ex. 15. Although a new partnership was never formed, the parties referred to this entity as "GTP II".

### B. Karaeff and her Relationship with the Harts

Debra Hart met Karaeff at an open house in 2004. Later that year, Debra Hart listed and sold Karaeff's Oakland home, and was Karaeff's agent when she purchased a home in the Harts' Diablo neighborhood. Toby and Lance remodeled that home for Karaeff. During this time, Karaeff became a close friend of Debra and Toby Hart. She was a fixture at their Diablo home at Canada Via, having dinner there frequently between 2005 and 2009. She was a friend of the Harts, and particularly of Debra Hart, until Debra filed bankruptcy in 2011.

Neither side sought to characterize Karaeff as a sophisticated investor and/or lender in real estate development ventures, and nothing proven during the trial would support such a characterization.

### C. Shady Glen

Shady Glen was a 2.21 acre parcel of undeveloped land on a hillside in Walnut Creek,

-6-

California, that was acquired by NHII in 2003 for $1,200,000. NHII is a suspended California Corporation that was formed in September 2002 by Debra Hart as a vehicle through which to take her real estate sales commissions (to minimize her tax liability). Debra Hart, Toby, and Lance jointly owned NHII, and Debra was the President. Defs.' Trial Ex. 2.

Thereafter, NHII effected a lot split into what would be known as "Lot A" and "Lot B", each slightly larger than one acre. Toby and Debra Hart, acting through NHII as corporate general partner, formed GTP in 2004 for the ostensible purpose of building homes on Lots A and B, respectively. That project experienced challenges which will not be detailed here. In 2006, Toby and Debra Hart, through their management roles in NHII, transferred both lots to Debra, personally, as her sole and separate property. Lot B was deeded to Debra Hart on August 1, 2006. Lot A was deeded to Debra Hart on September 7, 2006. Each deed was recorded shortly after its execution.

When Karaeff entered the scene as an investor and then later as a lender, Debra Hart owned the entire Shady Glen property. The house on Lot A was under construction, financed through a construction loan from Washington Mutual Bank ("WAMU") which was secured by a deed of trust on Lot A. Lot B was undeveloped at that time, but Sequoia Mortgage Capital held a deed of trust on Lot B securing debt owed by Debra Hart in the aggregate amount of $400,000 (i.e., a loan Debra obtained on August 1, 2006, and a loan Debra obtained on October 19, 2006, each in the original principal amount of $200,000). Pls.' Trial Ex. 7. The testimony at the trial in the Prior AP was express and uncontroverted that by the time of Debra Hart's acquisition of Shady Glen in 2006, she had decided not to build a house on Lot B.

D.      Transactions between Karaeff and the Harts or their Entities

There are four transactions between Karaeff and the Harts which Karaeff contends created non-dischargeable against Toby: (1) the August 15, 2007 $200,000 obligation; (2) the August 27, 2007 $100,000 loan; (3) the December 10, 2007 $50,000 loan; and (4) the May 20,

-7-

2008 $100,000 loan.[5]

## 1. The First $200,000 – August 15, 2007

On August 15, 2007, Karaeff wired $200,000, an advance on her WAMU home equity line of credit, to the account of Two Harts, Inc. The events that gave rise to the transfer were disputed in the Prior AP. By any account, it is not disputed that the $200,000 was to have been paid back to Karaeff within one year, either as repayment of a loan, or as a return on an investment in a partnership. Testimony again diverged on the nature of the obligation and the parties involved.

Karaeff testified in this proceeding and in the Prior AP that in August 2007, while the two were driving home from a dinner, Debra Hart told Karaeff that she needed to "get her money working for her." Karaeff testified that as a result of Debra Hart's involvement in the sale of her Oakland home and the purchase of her Diablo home in 2004, Debra knew Karaeff had substantial equity in the new residence. Karaeff further testified that over the following days Debra Hart brought her to the Shady Glen property site, and showed her the house on Lot A saying it would be completed in 30 to 45 days. In the prior AP, Karaeff had testified that Debra Hart showed her the property lines for Lot B. According to Karaeff, Debra Hart also told her that the property was free and clear of liens. Then, Karaeff said, Debra Hart again told her that she needed to get her money working for her and that it was time she became a partner.

Encouraged by Debra Hart's advice, Karaeff approached her bank to obtain a home equity line of credit for use in investments. According to Karaeff, when the loan officer at her bank told her she would only qualify for a $60,000 loan, Debra Hart directed her to a loan officer whom she knew at WAMU. Following up on that advice, over the next two days Karaeff sought and obtained a $500,000 line of credit from WAMU against her residence.

Karaeff testified in the Prior AP, and it is not inconsistent with the allegations in this

---

[5] At the trial in the Prior AP, the Harts testified that all of Karaeff's dealings were with Toby – that Toby received all funds, that Debra was not present when Karaeff gave Toby any money, that she was not present when any financial agreements were discussed, and that she was not present when Toby purportedly gave notes to Karaeff. Toby testified that he did not first disclose the existence of agreements between himself and Karaeff to Debra until either very late in 2010 or early in 2011.

Case: 14-04081   Doc# 25   Filed: 07/15/15   Entered: 07/16/15 09:15:23   Page 8 of 24

proceeding, that she initially only wanted to invest $100,000 in the partnership, but over dinner Debra Hart and Toby convinced her to commit $200,000, telling her that they needed money immediately to obtain permits and plans for Lot B.

Karaeff testified that the $200,000 was an investment in GTP II as described by the parties' Limited Partnership Agreement ("LPA", Pls.' Trial Ex.15) and a Subscription Agreement ("SA", Pls.' Trial Ex. 14), which described the potential development of Lot B. She offered into evidence these agreements at the May 4 trial, each signed by herself and Toby as President of NHII (the purported general partner of GTP II) and dated August 17, 2007. The LPA contemplated 96 limited partnership units, at $25,000 each with a minimum contribution of four units, for total capital of $2,400,000. Of this amount, $1,400,000 would be used to purchase the land from the general partner, NHII, and the remaining $1,000,000 would fund construction.

The SA included a provision that in the event of partnership under-subscription, the general partner would promptly notify the subscribed investors and promptly return, in full, all subscription monies. Pls.' Trial Ex. 14, at 1.

As previously noted, Debra Hart herself and not NHII (or GTP II) owned the entire Shady Glen property, including Lot B, at the time that Karaeff and Toby signed these documents.

Karaeff testified at the Prior AP that Debra Hart gave her the partnership documents to review during a meeting in the family room of the Harts' Diablo home with Toby present. According to Karaeff, this exchange occurred two days before the $200,000 was wired, that is on or around August 13, 2007. She then reviewed the documents, returned to the Harts' home, and signed another set of the same documents on or around August 17, 2007. Her testimony at the Prior AP was that Toby gave her that second set, identical to the documents that she had previously reviewed, and she signed them in the Harts' kitchen with Debra present.

In the Prior AP, Toby had testified that the $200,000 advance was a loan from the outset, between Karaeff and himself personally, and not an investment in any partnership, and offered into evidence a purported promissory note also dated August 15, 2007 reflecting a $200,000 loan from Karaeff to Clyde Hart, individually, at twelve percent (12%) interest. Defs.' Trial Ex. 43,

-9-

1    *Beverly Karaeff v. Debra Hart et al.,* Adv. Pro. No. 11-4177 (Bankr. N.D. Cal. June 6, 2011).[6]

2    Karaeff testified in the Prior AP that she never received this or any other promissory note in

3    connection with her dealings with the Harts.[7]  Karaeff directly disputed the Harts' account which

4    was that Debra was not at these meetings and that Toby gave her all partnership-related

5    documents.  As indicated in the March 2014 Decision, the Court found Karaeff's account more

6    credible than the Harts', based both upon an objective review of the evidence and the overall

7    credibility of the witnesses.

8            The provisions of the SA and the LPA notwithstanding, that the purpose of GTP II was to

9    acquire and develop Lot B, in the Prior AP Toby admitted that none of the $200,000 transferred

10   by Karaeff on August 15, 2007 went to the development of Lot B.

11                      **2.    Subsequent Loan Transactions Totaling $150,000**

12           On August 27, 2007, Karaeff wrote a check to Two Harts, Inc. for $96,250 which

13   represented a $100,000 loan for a 90 day term at fifteen percent (15%) interest with projected

14   interest subtracted from the loan amount.  While testifying in the Prior AP, Karaeff recalled that

15   on the day she agreed to lend the funds, August 27, 2007, Toby came to her house and asked for

16

17

18           [6] In an effort to explain the existence of the signed SA and LPA, Toby testified that he discussed the
     agreements with Karaeff in the garage of the Harts' Diablo home.  He maintained that the parties never entered into
19   the LPA, because he was not sure that he would ever develop Lot B.  This agreement, as recounted by Toby, was a
     "backup and probably would never happen."  Trial Tr., 242:10-11, Aug. 8, 2013.  According to Toby, the
20   partnership agreement, if enacted, could allow Karaeff to receive a return in excess of the twelve percent (12%)
     interest under the alleged promissory note.  He recalled the garage conversation with remarkable clarity, saying "I
21   can remember the conversation with Beverly, I can remember the context of the conversation, I can remember her
     understanding of the conversation..."  Trial Tr., 242:7-10, Aug. 8, 2013.  Toby said that he would never have had
22   that conversation about the Limited Partnership in front of his wife who owned the entire property, intended to live
     on Lot A, and did not want Lot B developed.  He maintained that Debra was not present when he handed the LPA to
23   Karaeff.  Toby testified that he never disclosed to Debra that he had prepared and Karaeff had signed the SA and
     LPA.

24
             [7] In the Prior AP, the Harts offered the testimony of escrow officer Jack Babcock, who had done frequent
25   business with Toby over the course of seventeen years in various roles including serving as escrow agent and
     assisting in the drafting of lending documents, i.e. promissory notes and deeds of trust.  Babcock was asked if he
26   could identify notes that Toby testified he gave Karaeff.  Defs.' Ex. 43-46; Trial Tr. 160, August 8, 2013.  He
     testified that he could identify them, from the language of particular provisions therein, and that he had prepared
27   each note at Toby's direction.  Babcock was not asked when he prepared each note or whether he specifically
     remembered drafting the notes on the dates written on each note.  There was no testimony that Babcock delivered the
28   notes to Karaeff or otherwise had knowledge of their delivery.

                                                            -10-

$100,000. According to Karaeff, Toby said that there was a bank loan for the construction of Lot A and that they were not receiving their draws on schedule. He said that he needed $100,000 to finish the house on Lot A. Karaeff testified in the Prior AP that she received no promissory note for this loan.

According to Karaeff, Toby again came to her in early December, asked for $50,000, and said that he needed it to finish the house on Lot A. Karaeff testified that the $46,151 amount represented a $50,000 loan for a 30 day term at fifteen percent (15%) interest with projected interest subtracted from the loan amount.[8] Karaeff again denied receiving the note that the Defendants offered as an exhibit. Defs.' Trial Ex. 45.

Toby's testimony at the Prior AP was materially different from Karaeff's on the subject of the August 27 $100,000. Consistent with his contention that the initial $200,000 was a loan, he testified that ten days after the money was lent, Karaeff came back to him and said she needed a higher rate of return. According to Toby, Karaeff committed another $100,000 and agreed to return the partnership agreement which was now void and would never be put into place. Toby testified that Karaeff would earn fifteen percent (15%) interest on the total $300,000 for a monthly interest payment of $3,750. Defendants presented a promissory note for $300,000. Defs.' Trial Ex. 45. Karaeff testified that she never received the $300,000 note and never received payments from Toby of $3,750 as interest for that alleged obligation; that she believed Toby lied under oath when he said he gave her notes and made payments.

As for the December 10 $50,000, in the Prior AP Toby did not testify regarding the surrounding details of this loan – he merely acknowledged borrowing the money, and said he gave Karaeff a note separate from the alleged $300,000 note. Toby took a different view on why the check amount was $46,151, testifying that the deduction was not prepayment of interest for the subject loan but rather payment of interest due from November and December 2007 on what

---

[8] According to the Court's calculation, this does not add up. Monthly interest on $50,000 at 15% would be $7,500. And in general, the agreements and interest rates as testified by the parties are included in this Memorandum primarily for the purpose of conveying the bargains that the parties believed they were entering into and the payments which resulted. The Court has not used arithmetic mistakes as reflected in testimony in its assessment of the parties' credibility. There appear to be inaccuracies in the figures set forth by both sides.

-11-

he alleges was a $300,000 note.

### 3. The "Mendelson" $100,000

On May 20, 2008, Karaeff wrote a check in the amount of $100,000 payable to Two Harts, Inc. According to the parties' testimony in the Prior AP, this amount was to be transferred to a Mr. Kyrille Mendelson ("Mendelson"). Toby and Mendelson had frequent business dealings and according to Toby it was their practice to loan each other money without documenting the transactions with notes. Although the parties disputed whether Mendelson actually received the funds, the May 2008 loan was referred to over the course of these proceedings and will herein be referred to as the "Mendelson $100,000."

Karaeff testified in this proceeding that she was watching television with Toby and Debra Hart at their house on May 20, 2008. Toby was on the phone, stopped his conversation, and asked Karaeff if she would like to make a quick $6,000 through loaning an associate of his $100,000 that would be paid back in 30 days at six percent (6%) interest. It was later revealed to Karaeff, by Toby, that this associate was Mendelson.

After 60 days, when she had not received payment, Karaeff inquired of Toby when payment would be received. Karaeff testified that Toby told her the money had been lost and that because he vouched for Mendelson he would treat the debt as his own and pay fifteen percent (15%) interest.

Toby's version, again, is that Karaeff came to him looking for an opportunity to make money quickly. He recalled the evening described by Karaeff – both Karaeff and Toby remember watching the same television program at the Harts' home on the night that the Mendelson money was committed. In contrast to Karaeff's testimony, Toby testified that the money was "committed" on May 7, 2008, and not paid until May 20, 2008. He was unable to explain with any credibility how the $100,000 was transferred out of Two Harts to Mendelson.

It was not disputed in the Prior AP or in this proceeding that Karaeff's $100,000 was included in a deposit amount of $133,550 into the Two Harts account on May 22, 2008. When asked in the Prior AP to review copies of all checks written on that account from May 2008, Toby could not identify a $100,000 check to Mendelson that would evidence the transfer of the

-12-

Karaeff funds to Toby's associate. Mendelson did not testify in this trial. But in deposition testimony read into the record in the Prior AP, Mendelson testified that he did not receive a $100,000 loan from Toby in 2008 – that borrowing between them ceased because the two were financially strapped.

In the Prior AP, Toby attempted to explain how he transferred the Karaeff money to Mendelson. On May 7, 2008, there was a $43,000 cash withdrawal from the Two Harts account. Toby testified without any documentary verification that this sum went to one of Mendelson's companies. When cross-examined as to how $100,000 was ever paid out of Two Harts to Mendelson, Toby said that $50,000 must have been paid out of another Two Harts account. The Court surmises that Toby was testifying that the $43,000 documented withdrawal, added to the $50,000 undocumented, unproven withdrawal, would result in $93,000 to Mendelson with origins in the Karaeff $100,000. Notably, this understanding is inconsistent with evidence coming from the Harts' own side. Lance had previously testified that there was only one Two Harts checking account. No evidence of a second account's existence was presented over the course of the trial.

Toby acknowledged that he never received a note from Mendelson and did not initially give Karaeff any note to document their agreement on the $100,000. Instead, when Karaeff came to him and pressed him for payment which he knew was not forthcoming from Mendelson, he accepted the debt as his own and wrote her a note dated January 10, 2009. The note was for a one year term. It did not specify a percentage rate for interest; rather, it stated that $6,000 in total interest would be paid. Defs.' Trial Ex. 46. Karaeff denied receiving any such note.

### 4. The Consolidated $500,000 Loan

In the Prior AP, Karaeff testified candidly, if not with great sophistication, that the GTP II limited partnership "expired" on August 27, 2008 and was replaced by a new agreement she had with Toby. There was no clear testimony regarding when this new agreement was entered into – from the context, it is clear that this happened some time in the fall of 2008, certainly before interest payments began in December 2008. Karaeff and Toby agreed that they added the $450,000 in funds previously advanced, added in missed interest payments, and rounded the

-13-

resulting figure to $500,000. By all accounts, this was an oral agreement. Payments of $5,000 on this note began on December 4, 2008, and continued through January and February 2009. There were no further payments.[9]

In July 2009, Karaeff, joined by her boyfriend Joseph Farais, her mother, and her step-father, confronted Toby about his failure to pay on the consolidated loan or even to supply Karaeff with any evidence of indebtedness, i.e. notes. This family meeting occurred at Karaeff's home in Diablo. At the meeting, Toby told everyone that Lot B had been lost to foreclosure. In July 2009, Karaeff undertook an investigation of public records, and those records indicated Shady Glen was encumbered by liens. Trial Tr. 36:12, *et seq.*

## III.

## KARAEFF'S CAUSES OF ACTION AGAINST TOBY

In the Prior AP, the Court found the Harts' testimony to be unreliable, and the Court ultimately based its conclusions of law, in large part on the facts it found through the credible testimony of Beverly Karaeff and supporting exhibits. Karaeff's testimony at trial on May 4 was consistent with her testimony in the Prior AP. Toby's testimony did not address most of the elements necessary to establish non-dischargeabilty under § 523(a)(2), and to the extent that his testimony sought to establish a statute of limitations defense, that defense has been abandoned in the Defendant's Post-Trial Brief. Consequently, the Court in this adversary proceeding also bases its conclusions of law, in large part on the facts it finds and determines through the credible testimony of Beverly Karaeff.

In order for the Court to determine a debt to be non-dischargeable under § 523(a)(2)(A), five elements must be established: (1) that the debtor made the statement; (2) knowing the statement was false; (3) with the intent to deceive or induce reliance; (4) that such reliance was induced and was justifiable under the circumstances; and, (5) that damages resulted. *See, e.g., In re Eashai*, 87 F.3d 1082, 1086 (9th Cir. 1996). For the reasons set forth below, the court finds

---

[9] This new oral agreement did not negate the fraud by Toby and Debra Hart in the initial transactions, and does not effect the Court's non-dischargeability analysis with regard to the four transactions at issue. *Archer v. Warner*, 538 U.S. 314, 321-22 (2003).

-14-

the August 15, 2007, the August 27, 2007, and the May 20, 2008 transactions to be non-dischargeable as to Toby Hart.

**A.     523(a)(2)(A) regarding the August 15, 2007 $200,000**

As an initial matter, the court acknowledges that the parties' accounts of the circumstances surrounding Karaeff's August 15 2007 transfer of $200,000 differed substantially in the Prior AP, and led to very different characterizations of the resulting legal relations between the parties:  Karaeff asserted, adamantly, that she provided the funds as an investment into GTP II, based on the representations in the partnership documents, as confirmed and amplified by Toby and Debra Hart, and that it was only when she failed to receive the promised return on equity within the one-year-from-execution time period set forth in the partnership documents that she and Toby orally agreed to "roll up" the $200,000 investment with the amounts subsequently loaned, to create the $500,000 obligation described at *supra* Part II.D.4.  Toby contended in the Prior AP that the August 15 transfer of $200,000 was a personal loan from Karaeff to him, and that he and Karaeff only discussed her becoming a partner in GTP II after the funds had been lent, and only as a potential "fall back" transaction.

The court found Karaeff's account and resulting characterization of the August 15 transfer as an investment in a partnership more credible than Toby's account, for a number of reasons. First, Karaeff produced a copy of the Limited Partnership Agreement signed, contemporaneously, and unquestionably, by she and Toby.  Second, although Toby claimed that the transaction was a loan, and produced what he claimed were copies of promissory notes delivered to Karaeff, Karaeff denied, adamantly and persuasively, that she ever received a note from Toby with respect to this transaction.  Of course, the notes were not signed or acknowledged in writing by Karaeff (and there was no reason why they should have been), but neither Toby nor Jack Bishop, the witness whom Toby offered to "authenticate" the notes as the purported author thereof, offered any oral testimony or any written confirmation that the alleged notes were ever delivered to Karaeff.  Nor could Babcock recall with any precision when he had allegedly prepared the notes. Third, Karaeff's claim never to have received any notes from Toby was entirely consistent with her testimony, not directly refuted by Toby, that Karaeff complained to Toby at the July 2009

-15-

meeting with Karaeff, her family and Toby that she had never received any documentation respecting any loans between them. Fourth, Karaeff's testimony that, first through Debra suggesting that she "make her money work for her" (and then showing her Lot B), and soon thereafter through Toby's discussing the partnership with her, the Harts worked together to induce her through the lure of a sophisticated partnership to advance a large amount of money, $200,000, was inherently plausible, and credible. Toby's testimony that Debra knew absolutely nothing of these transactions for years thereafter, and Debra's tepid testimony that she "can't recall" whether she made the suggestion that Karaeff get her money working for her during a visit to Shady Glen, were simply neither plausible, nor credible. And fifth, and not to be overly cynical, but the evidence was clear that by August 2007, the Harts were desperate to obtain additional funds to complete Lot A, and it is simply more plausible in the court's mind that they would approach their relatively unsophisticated friend with a proposal to invest in a partnership, to extract a larger amount of money from Karaeff, as well as to avoid questions in the short term about the money's use or the prospect for repayment, than that they would have asked for a loan. For all of these reasons, and based as well upon the general demeanor of the witnesses, and the court's contemporaneous impressions of the implausible and untrustworthy character of the Harts' testimony on a number of issues in this action, the court concluded in the Prior AP, and concludes again in this proceeding, that Karaeff's testimony with respect to the circumstances surrounding the August 15 transaction is credible.

### 1. The Debtor Made the Statements

The Court finds that Toby made the following statements to Karaeff with regard to the $200,000 transferred August 15, 2007 for the development of Lot B through what Debra and Toby represented to be a limited partnership: (1) Toby told Karaeff that Lot A was going to be completed in 30-45 days & Lot B would be completed in one year (Trial Tr. 26:1-3, May 4, 2015); (2) Toby gave Karaeff the SA, which included the statement that, in the event of under-subscription, all subscription monies would be returned to the limited partners; (3) Toby gave Karaeff the LPA, the stated primary purpose of which was the development of Lot B. All of these statements were false.

-16-

The first statement is false if for no other reason than that by August 2007, the Harts had decided *never* to build a house on Lot B. And, to the extent that the documents purporting to describe GTP II's business plan also rely on Lot B's development, all of those documents were false from the inception.

It could be argued that Toby himself did not make the statements found in the SA and LPA and that any false statements within these documents are only attributable to NHII. However, as the Court determined in the March 2014 Decision, courts have consistently held individuals responsible for statements made in partnership documents where those individuals are closely affiliated with the affairs of the partnership or its management and the individual aids in preparing the documents, delivering the documents, or otherwise causing the documents' statements to be communicated. *Sherwin Williams Co. v. Grasso (In re Grasso)*, 497 B.R. 434, 442-443 (Bankr. W.D. Penn. 2013) (finding the debtor to be an "insider" of the general partnership through analysis of 11 U.S.C. § 101(31); therefore, statements in partnership documents were attributable to the debtor); *Park v. Moorad (In re Moorad)*, 132 B.R. 58, 62 (Bankr. N.D. Okla. 1991) ( holding that "[b]y causing the [private placement memorandum] to be prepared and circulating it with the intent others rely on it in making investment decisions, [debtor/defendant] became responsible for the veracity of its contents."). This Court also concludes that Toby is responsible for the falsity of these statements.

And while there is no evidence that this $200,000 ever reached Toby in his individual capacity, the United States Supreme Court has held that the debtor need not receive a benefit for a debt obtained through their fraud to be determined non-dischargeable. *Cohen v. De La Cruz*, 523 U.S. 213, 221 (1998); *see also*, *Ghomeshi v. Sabban* (*In re Sabban*), 384 B.R. 1, 6 (B.A.P. 9th Cir. 2008).

Finding clear statements, both oral and written, by Toby to Karaeff with regard to proposed development of Shady Glen through GTP II, the Court next considers the nature and

-17-

effect of those statements under the remaining elements of 523(a)(2)(A).[10]

## 2.    Knowing the Statements were False

The Court concludes that Toby knew that these statements were false when he made them. It is abundantly clear that the Harts had no plans to build a house on Lot B–in contrast to the story told to Karaeff–that Lot B would be developed and sold, and profits distributed to partners within one year. The statements in the SA were also false, and the Court determines that Toby knew this at the time. Karaeff's eight partnership shares were the only shares subscribed of the 96 required to fully subscribe the partnership. Even with this substantial under-subscription, Toby never attempted to return Karaeff's investment. Finally, the property was not free and clear at the time that Karaeff committed her $200,000. Both Lot A and Lot B secured various debt obligations in August 2007. Lot A had the construction loan against it, in the approximate amount of $1,800,000, secured by a deed of trust held by WAMU. Lot B had at least one deed of trust against it securing an obligation, or obligations, to Sequoia.

## 3.    Intention of Deceiving, Inducing Reliance

After finding false statements, that Toby knowingly made, it is easily determined that Toby intended to deceive Karaeff and induce her reliance on those statements. Toby supplied partnership documents for GTP II, a sham "partnership" which was never formed, and was never intended to be formed. Toby made other oral false statements regarding the development of Lot B, which in Toby's own admission was never going to happen on his wife's watch. Toby also convinced Karaeff to commit $200,000, after Karaeff expressed that she was initially inclined to invest $100,000. Toby's intention to deceive Karaeff is immediately apparent from the obvious ruse of a partnership that was never formed and was never intended to achieve its stated purpose.

---

[10] On the cross examination of Beverly Karaeff at the May 4 trial, the defense attempted to show that Beverly Karaeff was told by Debra that the Shady Glen property was encumbered by a construction loan and was not free and clear. However, since Lot B was not encumbered by a deed of trust securing the construction loan from WAMU in any event, this testimony is of no consequence. And, to the extent that Lot B was encumbered by separate–non-construction debt deeds of trust in favor of Sequoia, the statement that the subject matter of GTP II, Lot B, was free and clear, was clearly false.

## 4. Justifiable Reliance

The Supreme Court, drawing from the Second Restatement of Torts, set forth the standard for justifiable reliance in *Field v. Mans*, 516 U.S. 59 (1995), with its holding that "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id* at 71. The Court determines that Karaeff's reliance on Toby's statements was justifiable.

Karaeff and Toby were close friends. Karaeff had no prior experience in real estate development through a partnership. She trusted the expertise of her friend, Toby, who convinced her that the investment was a good idea through any number of statements both oral and contained within the partnership documents Toby supplied her. It is also clear that Karaeff knew of, and relied on, Toby's experience and sophistication in real estate development. Under these facts, justifiable reliance is established without difficulty.

At the trial on May 4, the defense attempted to establish that Karaeff only relied on Toby's wealth, and that this prevented a finding of nondischargeability under 523(a)(2)(A) because a false statement of financial condition cannot be the basis for a finding of nondischargeability under this code section. The court finds this argument unconvincing for two reasons. First, as presented above, Kearaeff relied on factors in addition to the apparent wealth of the Harts, such as the close personal relationship and trust between her and Toby, as well as her perception of Toby as a savvy real estate developer. Although Karaeff may not have had as close of a relationship with Toby as she did with Debra Hart, her testimony indicates she trusted Toby as a family member. Trial Tr. 10:5-10. Second, the language under 523(a)(2)(A) "other than a statement respecting the debtor's . . . financial condition," should be interpreted narrowly to include formal written accounting documents, and not broad oral or written statements concerning financial wealth. *See In re Belice*, 461 B.R. 564, 577-78 (B.A.P. 9th Cir. 2011) (holding "that the phrase 'statement respecting the debtor's ... financial condition' should be narrowly interprete"); *In re Joelson*, 427 F.3d 700, 714 (10th Cir. 2005) (adopting a strict interpretation of statements of financial condition). *But see In re Urban*, 2014 WL 1492717, at

-19-

1  *7 (B.A.P. 9th Cir. April 16, 2014) (finding statements made regarding overall health of insider's

2  financial condition could not be excepted from discharge under 523(a)(2)(A)). Therefore, casual

3  references made by Toby to Karaeff regarding his wealth do not preclude a finding of non-

4  dischargeability based on the fraudulent statements made by Toby concerning the real estate

5  projects, and made by Toby regarding the development of Lot B.

6            **5.      Damages**

7            Karaeff was damaged as a result of her reliance on these false statements by Toby.

8  Karaeff subscribed $200,000 in a partnership that was never fully subscribed, her money was not

9  returned to her, and the money was not used to develop the Lot B property for which it was

10 committed.

11           In summary, on August 15, 2007, Toby defrauded Karaeff when he induced her to invest

12 $200,000 into a partnership, GTP II, that was to obtain and build a house on Lot B of Shady

13 Glen. At this point in time, NHII no longer owned Shady Glen; rather that property was the sole

14 and separate property of Debra Hart. And GTP II was never actually formed, it was simply a ruse

15 to dupe Karaeff. Based on the foregoing, all elements of 523(a)(2)(A) established, this Court

16 determines that the $200,000 investment is non-dischargeable in the bankruptcy of Toby Hart.

17           **B.      523(a)(2)(A) Regarding the August 27, 2007 $100,000 Loan.**

18           Toby came to Karaeff on the date in question and said that he needed $100,000 to finish

19 the house on Lot A. This statement was false when made. The money that Karaeff loaned was

20 never used to develop Lot A, and, because of the speed with which these funds were spent for

21 purposes that did not appear to have anything to do with Shady Glen, as established in the Prior

22 AP, one may infer that it was never intended to be used for Lot A. In his trial testimony, Toby

23 said he could not recall whether any amount of that sum was used in the construction on Lot A.

24 But during his deposition, Toby admitted that none of the proceeds of that loan were used for

25 Shady Glen. Toby intended to deceive Karaeff by inducing her reliance on the false statement.

26 He did so, and Karaeff justifiably relied on Toby's statement. The grounds for justifiable

27 reliance for this transaction are identical to the justifiable reliance grounds for the August 15

28 transaction, based in large part on the close proximity of this transaction to Karaeff's original

-20-

investment, and the lack of any "red flags" that would have raised concerns to a person in Karaeff's position.   *See In re Eashai*, 87 F.3d 1082, 1091 (9th Cir. 1996) (finding justifiable reliance because no red flags); *In re Obara*, 2014 WL 2211768, *10 (B.A.P. 9th Cir. May 28, 2014) (finding although minor defaults justifiable reliance because no red flags).  Damages resulted when the money, loaned for the completion of Lot A, was not used in any part for that purpose and was not returned to Karaeff.

### C.     523(a)(2)(A) Regarding the The December 10, 2007 $50,000

According to the testimony in the Prior AP and at the May 4 trial, Toby came to Karaeff again in December 2007 saying he needed a loan of $50,000 to finish Lot A, and that the construction on that Lot would be completed, and the amount repaid, within thirty days.  In his testimony in the Prior AP, he could not recall whether any amount of that loan went toward the construction on Lot A.  Unlike the August $100,000 loan, Toby was not confronted with any prior testimony that the December $50,000 did not go to develop Lot A.  There is no record before the Court that the money went elsewhere.

In the March 2014 Decision, the Court considered whether circumstantial evidence could support a finding of nondischargeability regarding this transaction.  The Court concluded that the circumstantial evidence of falsity was not especially convincing.  The testimony presented at the May 4 trial does not change this analysis.  For the reasons set for the in March 2014 Decision, the Court cannot conclude that Toby's statements in connection with this transaction were false when made.[11]

### D.     523(a)(2)(A) Regarding the May 20, 2008 Mendelson $100,000

The Court finds Karaeff's testimony credible on the Mendelson transaction, in contrast to the Harts' testimony in the Prior AP which was evasive and relied on facts not proven in this trial.  The Court finds that Debra Hart and Toby jointly participated in this fraud, each making

---

[11] It could be argued that the statement was false because it would have been impossible for Toby to pay back the money in 30 days, and therefore the statement was false and Toby knew it was false.  The court believes it is extremely unlikely Toby would have been able to sell or refinance the property at that time to pay back the money.  However, no evidence was presented at trial to support this argument, and there was evidence that Toby owned other properties which might have provided a source of funds to repay Karaeff.

-21-

statements to solicit the Mendelson $100,000 from Karaeff.  Toby made the false statement that the $100,000 loan to which he was referring was intended for a friend. During his testimony at the trial in the Prior AP, Toby was unable to establish that these funds actually went to Mendelson, and it appeared much more likely that they were used to repay some other obligation of Toby's.[12]

The $100,000 was deposited into the Two Harts account on May 22, 2008.  Toby, when cross-examined in the Prior AP, was unable to demonstrate how the funds were disbursed to Mendelson.  His best explanation was that a $43,000 withdrawal on May 7, 2008, coupled with a $50,000 draw on "another" Two Harts account, amounted to a transfer of the Karaeff funds to Mendelson.  But the existence of another Two Harts checking account was not corroborated by any evidence.  Lance himself testified that Two Harts only had one checking account.  Toby's testimony that he thought Two Harts had another bank account is patently unreliable.  Moreover, Mendelson testified that he did not receive $100,000 from Toby at any time in 2008.  It follows that Toby made a false statement – that he would lend the money to his friend – as, in fact, the $100,000 never went to Mendelson.  Toby knew the statement was false when he made it.  He never intended to loan money to Mendelson on Karaeff's behalf.  It is far more likely that Toby, still not receiving construction draws at this time, was either seeking additional funds to finish construction on Lot A or seeking funds to pay some other obligation.  Karaeff had already committed $350,000 from prior transactions.  As a result of the relative sophistication of the parties, and close relationship between the parties, Toby induced Karaeeff's reliance, once more, on a statement he knew was false[13]

Karaeff's reliance on these statements was justifiable.  Given the close relationship between Toby and Karaeff, and relative sophistication of the parties, Karaeff's reliance on

---

[12] Memorandum of Decision Regarding Plaintiff Beverly Karaeff's Adversary Proceedings Against Defendants Debra A. Hart and Lance E. Hart, Adv. Pro. No. 12-04059, 11-04177, ECF No. 95 at 38 (Bankr. N.D. Cal. Mar. 7, 2012).

[13] Although Defendant tried to establish at trial the Plaintiff's reliance was not justifiable because she "knew" the loan was probably for Toby, the testimony actually showed that Plaintiff came to this realization later. Trial Tr. 53:18-22, May 4, 2015.

-22-

Toby's statement was justifiable. The Court finds that Karaeff was damaged by the fraud as the money that Karaeff loaned never reached its intended destination with Mendelson and was not otherwise returned to her. All elements of 523(a)(2)(A) are established and the Mendelson $100,000 is non-dischargeable.

**IV.**

**CONCLUSION**

Based on the foregoing, as related to the bankruptcy of Toby Hart, this Court finds debts of $200,000 (August 15,2007), $100,000 (August 27, 2007) and the $100,000 (May 20, 2008) non-dischargeable under 523(a)(2)(A). The facts concerning the $50,000 (December 10, 2007) do not support a determination of non-dischargeability under 523(a)(2)(A).

Upon the entry of this Memorandum, the Court will enter the appropriate judgment. For the reasons set forth at the conclusion of the March 2014 Memorandum of Decision, the Court concludes that the correct date for the commencement of interest is April 1, 2009, and the judgment should likewise be based thereon.

**\*\*END OF MEMORANDUM DECISION\*\***

-23-

COURT SERVICE LIST

Steven J. Hassing
Law Offices of Steven J. Hassing
425 Calabria Court
Roseville, CA 95747

Beverly Karaeff
P.O. Box 42
Dillon Beach, CA 94929

Clyde Hart
2639 Presidio Drive
Brentwood, CA 94513

David Ashley Smyth
Smyth Law Offices
3478 Buskirk Ave. #1000
Pleasant Hill, CA 94523-4378

-24-